## STATE OF CONNECTICUT *v.* CHE CARTER
## (12839)

O'CONNELL, FOTI and HEIMAN, Js.

Argued November 30, 1993—decision released April 12, 1994

*John R. Williams,* for the appellant (defendant).

*Carolyn K. Longstreth,* assistant state's attorney, with whom were *James Turcotte,* assistant state's attorney, and, on the brief, *Michael Dearington,* state's attorney, for the appellee (state).

HEIMAN, J. The defendant appeals[1] from the judgment of conviction, rendered after a jury trial, of murder in violation of General Statutes § 53a-54a (a).[2] On appeal, the defendant claims that the trial court improperly (1) refused to instruct the jury on self-defense, (2) prohibited him from offering evidence of prior criminal misconduct of the victim and two state's witnesses,

[1] This appeal was taken originally to the Supreme Court. Pursuant to Practice Book § 4023, the Supreme Court transferred the appeal to this court.

[2] General Statutes § 53a-54a (a) provides: "A person is guilty of murder when, with intent to cause the death of another person, he causes the death of such person or of a third person or causes a suicide by force, duress or deception; except that in any prosecution under this subsection, it shall be an affirmative defense that the defendant committed the proscribed act or acts under the influence of extreme emotional disturbance for which there was a reasonable explanation or excuse, the reasonableness of which is to be determined from the viewpoint of a person in the defendant's situation under the circumstances as the defendant believed them to be, provided nothing contained in this subsection shall constitute a defense to a prosecution for, or preclude a conviction of, manslaughter in the first degree or any other crime."

The defendant was found not guilty of conspiracy to commit murder in violation of General Statutes § 53a-48 (a). General Statutes § 53a-48 (a) provides: "A person is guilty of conspiracy when, with intent that conduct constituting a crime be performed, he agrees with one or more persons to engage in or cause the performance of such conduct, and any one of them commits an overt act in pursuance of such conspiracy."

(3) admitted a transcript of the probable cause hearing testimony of a witness, (4) allowed the prosecution to submit claims that the defendant had intimidated state's witnesses, (5) allowed the prosecutor to make improper and unlawful arguments to the jury, (6) charged the jury on consciousness of guilt, (7) encouraged jury deliberations during the presentation of evidence, (8) conducted a jury trial without having a twelve person jury through all portions of the trial, and (9) denied him food during the midday recess. The defendant also claims the benefit of the issues set forth in the brief filed in *State* v. *Dillon,* 34 Conn. App. 96, 640 A.2d 630 (1994).[3] We affirm the judgment of the trial court.

The jury could reasonably have found the following facts. On December 28, 1989, at about 3 p.m., Willie Peterson, John Peterson and Wilbert Cannon were passengers in a gray Jeep Cherokee being operated by Paul Darden and owned by Darden's sister. The vehicle was traveling on Sylvan Avenue in New Haven. Cannon was armed with a Mac-11 gun,[4] while Willie Peterson was armed with a .380 handgun.[5] Darden stopped the vehicle at the corner of Asylum Street and Sylvan Avenue and John Peterson exited the car. He entered a corner store on the right side of the street and emerged approximately five minutes later. Cannon and Willie Peterson then exited the vehicle and began to walk up the left side of Asylum Street toward Davenport Street. Darden remained standing by the vehicle. Norman Dillon, Eric Bush, Paul Anderson, the defendant and possibly one other person appeared in the middle of Asylum

---

[3] The defendant and Norman Dillon were tried as codefendants in the trial court. They are appealing separately. For our resolution of the issues presented by Dillon, see *State* v. *Dillon,* supra, 34 Conn. App. 96.

[4] John Peterson testified that a Mac-11 is an Uzi. Cannon testified that the gun was an automatic weapon that holds thirty-six bullets.

[5] John Peterson testified that a .380 is a type of automatic handgun. Cannon testified that the gun held nine bullets.

Street about fifteen feet from Cannon and Willie Peterson. Several members of that group had threatened Cannon and Willie Peterson in the past.

Upon seeing the group, Willie Peterson and Cannon turned around and walked away. Gunshots rang out.[6] The group then consisted of only three or four people,[7] each of whom had a gun and was firing toward Cannon and Willie Peterson. The group firing at Willie Peterson and Cannon included the defendant. Cannon turned around, pulled out his gun, fired about thirty shots toward the group and ran toward a field on the left side of the street while Willie Peterson ran toward John Peterson on the right side of the street.[8] John Peterson observed Willie Peterson grab his back and fall to the ground, landing on top of his gun, which was cocked and in firing position. The defendant, Dillon and Bush ran up Asylum Street toward Davenport Street. Four males were also seen running down Davenport Street after the shooting.

Paul Halloran, an emergency medical technician employed by the New Haven fire department, arrived at the shooting scene approximately three minutes later. He observed a black male lying face down on the sidewalk of Asylum Street approximately two houses from the corner of Sylvan Avenue. The person did not appear to be breathing. He also observed a stainless steel gun lying a few feet away from the body, which he believed was a nine millimeter or .380 automatic, and several shell casings. Halloran assessed the victim's condition and found that the victim lacked vital signs.

[6] The prosecution elicited testimony that the first gunshots originated from the group of three or four. The defense elicited testimony from witnesses who did not know where the first gunshots originated.

[7] The testimony of Cannon indicated that one member of the group walked away before the shooting began.

[8] There also was testimony that a white BMW was slowly backing down Asylum Street toward Sylvan Avenue. None of the witnesses, however, testified that any gunshots were fired from the car.

He then proceeded to remove the victims clothes to initiate CPR. At that time, Halloran noticed that the victim had suffered a gunshot wound to the back rib cage area. The victim was transported by ambulance to the Yale-New Haven Hospital. The victim lacked vital signs upon arrival at the hospital, and was pronounced dead.

The New Haven police conducted an investigation at the scene and discovered on Asylum Street thirty-four nine millimeter shell casings, one .380 shell casing and one shell casing of unknown caliber. In addition, the police extracted one live round from the .380 handgun lying next to the victim. Twenty-six nine millimeter shell casings were located on the left side of Asylum Street near the corner of Sylvan Avenue. These casings were found in the same area as the single .380 caliber casing. Eight nine millimeter shell casings were found on the left side of Asylum Street closer to Davenport Street. These nine millimeter casings were found in the same area as the five .45 caliber casings.

The next day, from a photographic array, John Peterson identified the defendant as being at the scene of the shooting. On December 30, 1989, Cannon identified the defendant as having been involved in the shooting of Willie Peterson.

On December 29, 1989, H. Wayne Carver, chief medical examiner for the state of Connecticut, performed an autopsy on the victim. The autopsy revealed a gunshot wound in the back. It showed that the bullet entered the body at a forty-five degree angle from the left side and below the body, so that the trace of the bullet in the body followed an upward path from left to right, as if the victim was bending over when he was shot. The path of the bullet in the body also indicated that the shot was fired from behind the victim. The bullet followed a path through the eleventh rib, the lower

half of the left lung, the sac around the heart, and passed by the right lung and lodged in the collar bone. It caused damage to the left lung, the upper chambers of the heart, the aorta, the pulmonary artery, the superior vena cava, bruised the right lung and partially fractured the clavicle. A .45 caliber bullet was removed from the victim's body during the autopsy. The state forensic laboratory determined that that bullet had not been fired from Cannon's nine millimeter gun or from Willie Peterson's .380 caliber weapon. Although the autopsy revealed cocaine in the nose of the victim, it failed to reveal its presence in the victim's blood.

On January 4, 1990, Detective Anthony Dilullo of the New Haven police department interviewed Maria Diaz about the shooting. Diaz identified the defendant as one of the persons involved. She also told Dilullo that Carter was on the left side of the street during the shooting.

On October 6, 1990, Adam Luth, an Orange police officer, observed a green Saab on Route 1, Boston Post Road, in Orange. He noted that the vehicle displayed a rear marker plate, but lacked a front plate. Luth noted that there was a passenger in the car. The officer sought information about the vehicle from the department of motor vehicles. The department advised Luth that it had no information about the vehicle. The Saab pulled into a gas station on Boston Post Road and stopped. The officer approached the vehicle and asked the driver for his operator's license, registration and insurance card. The operator identified himself as Carlos Carter. The officer checked his name with the dispatcher and was informed that there possibly was a warrant for the operator's arrest. The officer then asked the passenger for identification. The passenger stated that he had no identification and that he was Harold Goldston. The officer then requested information from the dispatcher concerning Goldston. Luth returned to talk with the vehicle's operator, who was

pumping gas. The officer asked the operator the name of the passenger and the operator told the officer that the passenger was his brother Che. The officer then asked the passenger to exit the vehicle and asked him for his real name. The passenger said that his name was Che Carter. The dispatcher informed the officer that the arrest warrant was for Che Carter. The New Haven police department informed the Orange police that Che Carter had a round scar on the right forearm. The officer saw such a scar on the passenger's right forearm. The Orange police then detained the defendant until the New Haven police arrived. DiIullo came to the Orange police department and positively identified the defendant as the person wanted for murder. The detective then placed the defendant under arrest.

## I

The defendant first asserts that the trial court denied him his state and federal constitutional rights by improperly refusing to instruct the jury on the issue of self-defense. We are unpersuaded.

Certain additional facts are necessary for a proper resolution of this issue. The defendant, on January 13, 1992, the day final arguments commenced, submitted a request to the trial court to charge the jury on the law of self-defense. The trial court declined to give the charge because it was of the opinion that there was no evidence on the issue presented at trial and that the request did not comply with the requirement of the rules of practice of a timely request to charge. Practice Book § 853.[9] The next day, the jury asked the trial court whether it had addressed the issue of self-defense in its charge. The trial court answered "No."

[9] Practice Book § 853 provides: "Written requests to charge the jury must be filed in triplicate with the clerk before the beginning of the arguments *or at such earlier time during the trial as the court directs,* and the clerk shall file them and forthwith hand one copy to the judicial authority and one to opposing counsel." (Emphasis added.)

We first note that the request to charge does not appear to have been timely filed. The record reflects that on January 9, 1990, the trial court instructed counsel that they were to file requests to charge on the morning of January 10, 1990.[10] The transcript further reveals that defense counsel did not file his requests until January 13, 1990, the day of final arguments. Thus, the defendant failed to meet the obligation cast upon him by the trial court's order pursuant to Practice Book § 853. Since we conclude, however, that the trial court was correct in its determination that no evidence of self-defense was introduced during trial so as to require a charge on self-defense, we will not resolve the issue of whether the trial court properly excluded the requested charge because of the late filing.

We begin our analysis by setting forth again the principle that it is a fundamental element of due process under the due process clauses of the fifth[11] and fourteenth[12] amendments to the United States constitution, as well as article first, § 8,[13] of the Connecticut constitution, that a defendant charged with the commission of a crime has a right to establish a defense. *Washington* v. *Texas,* 388 U.S. 14, 19, 87 S. Ct. 1920, 18 L. Ed. 2d 1019 (1967); *State* v. *Miller,* 186 Conn.

---

[10] See footnote 9.

[11] The fifth amendment to the United States constitution provides in relevant part: "No person shall be . . . deprived of life, liberty, or property, without due process of law . . . ."

[12] The fourteenth amendment to the United States constitution provides: "Section 1. All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside. No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws."

[13] Article first, § 8, of the Connecticut constitution provides in relevant part: "No person shall . . . be deprived of life, liberty or property without due process of law . . . ."

654, 660, 443 A.2d 906 (1982); *State* v. *Jenkins,* 29 Conn. App. 262, 270, 614 A.2d 1249, cert. denied, 224 Conn. 916, 617 A.2d 171 (1992). This fundamental right includes the right to proper jury instructions on the elements of self-defense. *State* v. *Miller,* supra, 660–61; *State* v. *Jenkins,* supra, 271. This right, however, is not absolute. "[O]nly when evidence indicating the availability of [the defense of justification] is placed before a jury is a defendant *entitled* as a matter of law to a theory of defense instruction." (Emphasis in original.) *State* v. *Rosado,* 178 Conn. 704, 708, 425 A.2d 108 (1979); *State* v. *Clark,* 14 Conn. App. 511, 514, 541 A.2d 897 (1988); see also *State* v. *Adams,* 225 Conn. 270, 283, 623 A.2d 42 (1993).

"Before an instruction is warranted . . . [a] defendant bears the initial burden of producing sufficient evidence to inject self-defense into the case. . . . To meet that burden, the evidence adduced at trial, whether by the state or the defense, must be sufficient to raise a reasonable doubt in the mind of a rational juror as to whether the defendant acted in self-defense. . . . Only when the issue has been sufficiently raised does the state have the burden of disproving such defense beyond a reasonable doubt." (Citations omitted; internal quotation marks omitted.) *State* v. *Lewis,* 220 Conn. 602, 619, 600 A.2d 1330 (1991); *State* v. *Deptula,* 31 Conn. App. 140, 147, 623 A.2d 525 (1993), appeal dismissed, 228 Conn. 852, 635 A.2d 812 (1994).

When we are called on to review the trial court's failure to charge on the issue of self-defense after having been requested to do so, "we must adopt the version of the facts most favorable to the defendant that the evidence would reasonably support." *State* v. *Lewis,* supra, 220 Conn. 619; *State* v. *Havican,* 213 Conn. 593, 595, 569 A.2d 1089 (1990); *State* v. *Harrison,* 32 Conn. App. 687, 690, 631 A.2d 324, cert. denied, 227 Conn. 932, 632 A.2d 708 (1993). In this case, the evidence

adduced at trial was clearly insufficient to support the claim that the defendant acted in self-defense as set forth in General Statutes § 53a-19.[14]

The defendant asserts that, while the evidence supports a claim that the defendant fired a gun in the direction of the decedent, there was testimony that the combatants exchanged gunfire. We note that testimony supported the fact that the original shots were fired from the group that included the defendant. The only other evidence adduced at trial concerning the origin of the first shots was testimony that one witness was uncertain as to where the first shot originated. Fur-

[14] General Statutes § 53a-19 provides: "(a) Except as provided in subsections (b) and (c) of this section, a person is justified in using reasonable physical force upon another person to defend himself or a third person from what he reasonably believes to be the use or imminent use of physical force, and he may use such degree of force which he reasonably believes to be necessary for such purpose; except that deadly physical force may not be used unless the actor reasonably believes that such other person is (1) using or about to use deadly physical force, or (2) inflicting or about to inflict great bodily harm.

"(b) Notwithstanding the provisions of subsection (a) of this section, a person is not justified in using deadly physical force upon another person if he knows that he can avoid the necessity of using such force with complete safety (1) by retreating, except that the actor shall not be required to retreat if he is in his dwelling, as defined in section 53a-100, or place of work and was not the initial aggressor, or if he is a peace officer or a private person assisting such peace officer at his direction, and acting pursuant to section 53a-22, or (2) by surrendering possession of property to a person asserting a claim of right thereto, or (3) by complying with a demand that he abstain from performing an act which he is not obliged to perform.

"(c) Notwithstanding the provisions of subsection (a) of this section, a person is not justified in using physical force when (1) with intent to cause physical injury or death to another person, he provokes the use of physical force by such other person, or (2) he is the initial aggressor, except that his use of physical force upon another person under such circumstances is justifiable if he withdraws from the encounter and effectively communicates to such other person his intent to do so, but such other person notwithstanding continues or threatens the use of physical force, or (3) the physical force involved was the product of a combat by agreement not specifically authorized by law."

ther, the decedent was shot in the back, a clear indication that he was facing away from the defendant when the fatal bullet struck him. On the basis of the evidence, a reasonable doubt in the mind of a rational juror that the defendant acted in self-defense could not have been raised. *State* v. *Lewis,* supra, 220 Conn. 619. The jury could not have reasonably found, on the basis of the physical evidence and the fact that the victim was turned away from the defendant at the time he was shot, "that *at the time [the defendant] killed the victim,* it was reasonable for him to believe that the victim was about to use deadly physical force or inflict great bodily harm, and that it was necessary to kill the victim to prevent such conduct." Id., 620. The physical evidence clearly indicates that the victim was attempting to leave the scene and to extricate himself from the zone of danger. The fact that the bullet struck the victim in the back patently supports this conclusion. Just as the defense of self-defense does not encompass a preemptive strike; id.; it does not encompass a continuation of the encounter when the danger has passed since a reasonable belief that the person was using or about to use deadly physical force or was inflicting or about to inflict great bodily harm could not reasonably exist where the individual was retreating from the scene. Accordingly, the trial court was correct in declining to charge the jury on the elements of justification.

## II

The defendant next claims that the trial court improperly prohibited him from offering evidence concerning prior acts of misconduct committed by the victim and two of the state's witnesses.

## A

Certain additional facts are necessary for a proper resolution of this issue. On January 10, 1992, the state made a motion in limine requesting that the defend-

ant be precluded from introducing evidence as to whether Paul Darden, a state's witness, was a drug dealer. The state orally amended the motion to also exclude such testimony concerning the victim. The state made the motion after resting its case. The defendant wanted to introduce evidence of a federal grand jury investigation into the drug activity of the two people. The defendant had subpoenaed an agent of the Federal Bureau of Investigation (F.B.I.) and had marked for identification a report concerning the investigation of Detective John Datillo of the New Haven police department. The court granted the motion based on its reading of *State* v. *Avis,* 209 Conn. 290, 304, 551 A.2d 26 (1988), cert. denied, 489 U.S. 1097, 109 S. Ct. 1570, 103 L. Ed. 2d 937 (1989).

The trial court permitted the defendant to make an offer of proof and Datillo testified, in the absence of the jury, that after the victim's death, he had heard from an F.B.I. agent that a confidential informant had told the agent that Darden was a drug dealer. He further testified that Darden had not been a target of any of the investigations in which Datillo had been involved. The trial court again declined to allow the evidence stating that the evidence would be "at best, accusations by an unnamed informant that would not have to be divulged by the F.B.I. agent." Further, the trial court found that the alleged misconduct was not relevant to veracity. We conclude that the defendant's claim is without merit.

In argument before the trial court, the defendant asserted that the information relating to Darden was admissible on the issue of his credibility because he had denied involvement with drugs in his testimony in the probable cause hearing. Thus, the defendant posits that he was entitled to introduce the evidence in question to establish the fact that there existed some information in the possession of the F.B.I., apparently from

an informant, that Darden was involved in drug trafficking and that both the victim and Darden had been the targets of a federal grand jury investigation. The defendant's basis for claiming the evidence admissible with respect to the victim's alleged drug dealing is less clear than the basis for his claim with respect to Darden. The defendant offered no basis for the admissibility of the "evidence" concerning the victim to the trial court at the time of the argument on the state's motion in limine. Further, the defendant fails to offer any recognizable legal argument in his brief before this court other than the bare assertion, without citation of authority, that the possibility that Darden and the victim were "violent drug dealers" was important for the jury to know. The defendant also asserts that the "evidence" was admissible because the state, knowing the character of Darden and the victim as drug dealers, was "allowed to assure the jury that they were not and to preclude the defendant from even attempting to show that they were."

We first note that we do not agree with the defendant's assertion that the trial court's ruling precluded him from eliciting evidence concerning any role that Darden might have had in the sale of narcotics. The trial court permitted the codefendant, on his cross-examination of Darden, to ask Darden whether his companions were selling drugs for him at the time of the murder. Other than his attempt to introduce the police report and the testimony of the F.B.I. agent, the defendant made no attempt to develop other evidence that may have been admissible and would have produced the same result.

The defendant clearly desired to place in evidence the fact of the grand jury investigation and the information of the informant to establish the truth of the assertion that the victim and Darden were "violent drug dealers." The record fails to disclose that either

the F.B.I. agent or Datillo had personal knowledge of any illegal activities on the part of either Darden or the victim. In the offer of proof, Datillo expressly testified that Darden had never been a target of any investigation that he conducted and the record is silent as to any knowledge of either officer as to the victim. Thus, the proffered evidence constituted hearsay and could have been excluded on that ground alone. *State v. Vinal,* 205 Conn. 507, 514–15, 534 A.2d 613 (1987).

In addition, the evidence sought to be introduced was collateral in nature. "A witness may not be impeached by contradicting his or her testimony as to collateral matters, that is, matters that are not directly relevant and material to the merits of the case." *State v. Negron,* 221 Conn. 315, 327, 603 A.2d 1138 (1992). Further, the trial court is vested with broad discretion in ruling on the admissibility of evidence. Id., 328. As we have often stated, we will not disturb the trial court's exercise of discretion in dealing with evidentiary rulings absent a clear abuse of that discretion. Id.; *State v. Parker,* 197 Conn. 595, 601, 500 A.2d 551 (1985); *Marron & Sipe Building & Contracting Corp. v. Flor,* 22 Conn. App. 689, 714–15, 580 A.2d 508 (1990).

While we do not conclude, as did the trial court, that the ruling on this issue is controlled by *State v. Avis,* supra, 209 Conn. 304, we are satisfied that the trial court acted properly in excluding the evidence and did not abuse its discretion. See *State v. Sailor,* 33 Conn. App. 409, 413, 635 A.2d 1237 (1994); *State v. Mierez,* 24 Conn. App. 543, 547, 590 A.2d 469, cert. denied, 219 Conn. 910, 911, 593 A.2d 136 (1991).

### B

The defendant further asserts that the trial court improperly refused to permit him to develop facts concerning a drug arrest of Wilbert Cannon, a state's witness. The arrest took place on January 8, 1991, and

resulted in a nolle on October 4, 1991. He also asserts that the court improperly restricted his cross-examination of the witness concerning his carrying a weapon while on probation. In neither instance does the record support the defendant's claim either legally or factually, and we are thus unpersuaded.

The record reflects that during the defendant's cross-examination of Cannon, then twenty-one years old, the defendant attempted to elicit whether from the time that Cannon finished high school, he had ever been engaged in the sale of narcotics. The state interposed an objection and the jury was excused. After lengthy argument and discussion, counsel for the defendant indicated that he would ask Cannon questions concerning his alleged involvement with the sale of narcotics limited to a period of ninety days prior to the murder.[15] The defendant voluntarily abandoned his question and modified the inquiry to encompass only the ninety day period prior to the murder. Thus, the record does not support the defendant's claim that the trial court acted improperly in this regard.

Further, we note that both this court and our Supreme Court have consistently held that "evidence of an arrest in the absence of a conviction is generally not admissible even to attack credibility." *State* v. *Milner*, 206 Conn. 512, 518, 539 A.2d 80 (1988); *State* v.

---

[15] The transcript of the proceedings reveals the following occurred in the absence of the jury:

"[Defense Counsel]: Judge, I'm going to ask him some questions limited to ninety days limited about narcotics.

"The Court: That's fair enough."

\* \* \*

The jury returned to the courtroom and the transcript then reveals the following occurred in the presence of the jury:

"Q. Mr. Cannon, going back to December 28, 1989, and looking back ninety days before that, in other words, three months prior to December 28, 1989, were you ever involved in the sale or distribution of narcotics?

"A. No."

*Moynahan,* 164 Conn. 560, 600, 325 A.2d 199, cert. denied, 414 U.S. 976, 94 S. Ct. 291, 38 L. Ed. 2d 219 (1973); *State* v. *Moore,* 23 Conn. App. 479, 485, 581 A.2d 1071 (1990), cert. denied, 217 Conn. 802, 583 A.2d 132 (1991). Moreover, even where there has been a conviction of a narcotics offense, we have held that narcotics convictions are crimes that "do not reflect directly on the credibility of one who has been convicted of them. *State* v. *Geyer,* [194 Conn. 1, 12, 480 A.2d 489 (1984)]." (Internal quotation marks omitted.) *State* v. *Dobson,* 221 Conn. 128, 138, 602 A.2d 977 (1992). Even under the circumstances where a prior narcotics related conviction exists, the right to cross-examination is satisfied when the defendant is allowed to impeach the witness by inquiring into the existence of a prior unspecified felony conviction. Id., 137; *State* v. *Geyer,* supra, 16. Even if such a prior felony drug related conviction existed, the defendant never attempted to elicit the information from the witness.

Here, the defendant did not pursue his attempt to elicit evidence concerning narcotics activities. Moreover, despite the claim in his brief on appeal that he attempted to show the state's action as reflecting favorable treatment of the witness, no such claim was made before the trial court. Practice Book § 4185.[16] Review of evidentiary rulings is made on the specific legal ground asserted at the time of trial. *State* v. *Velez,* 17 Conn. App. 186, 192, 551 A.2d 421 (1988), cert. denied, 210 Conn. 810, 556 A.2d 610, cert. denied, 491 U.S. 906, 109 S. Ct. 3190, 105 L. Ed. 2d 698 (1989). This court is not in any way bound to consider claims of law not properly raised at trial. *State* v. *Robinson,* 227 Conn. 711, 741, 631 A.2d 288 (1993); *State* v. *Brice,* 186 Conn. 449, 457, 442 A.2d 906 (1982).

---

[16] Practice Book § 4185 provides in pertinent part: "The court on appeal shall not be bound to consider a claim unless it was distinctly raised at the trial or arose subsequent to the trial. The court may in the interests of justice notice plain error not brought to the attention of the trial court. . . ."

The record clearly reflects that the defendant failed to assert before the trial court the claim of admissibility that he now makes. "We have not yet reached a jurisprudential stage where we require trial judges to be mentally telepathic. Thus, we have consistently declined to review claims based on a ground different from that raised in the trial court." *State* v. *Ulen,* 31 Conn. App. 20, 29, 623 A.2d 70, cert. denied, 226 Conn. 905, 625 A.2d 1378 (1993). The defendant has not provided us with a reason to depart from this standard. Because the reason now asserted on appeal is different from that asserted before the trial court, we will not afford review of this unpreserved new claim.[17]

We next turn to the second part of this claim wherein the defendant asserts that the trial court improperly restricted his cross-examination of Cannon concerning his carrying a handgun while on probation. Again, the record fails to support the defendant's assertion that the trial court's actions hampered or unduly limited his cross-examination of the witness. He was permitted to develop the fact that, at the time of the murder, Cannon was on probation for the crime of manslaughter[18] and that while on probation he was carrying a weapon. Cannon also testified in response to a question that the

[17] We note that the defendant does not seek plain error review of this unpreserved claim; Practice Book § 4185; nor does he seek review of an unpreserved constitutional claim under the rubric of *State* v. *Evans,* 165 Conn. 61, 69–70, 327 A.2d 576 (1973), and *State* v. *Golding,* 213 Conn. 233, 239–40, 567 A.2d 823 (1989).

[18] The defendant told the trial court that he wanted to ask the witness whether he had ever caused the death of another human being. Having made this known to the trial court, the following then occurred:

"The Court: I'll allow you just to elicit were you on probation for manslaughter in the second degree?

"[Defense Counsel]: Okay."

We note that although the amendment to Practice Book § 288 eliminated the requirement that an exception be taken to an adverse ruling by the trial court, it was not amended to eliminate the requirement of an objection being made. Practice Book § 288; see *State* v. *Ulen,* supra, 31 Conn. App. 29.

weapon that he was carrying was a semiautomatic. We also note that the defendant did not press for the admission of any other questions concerning the prior manslaughter conviction or that Cannon's probation was not violated or that he was not charged with a crime.[19]

The record clearly reflects that trial counsel acquiesced to the trial court's ruling that he would limit the inquiry to his prior conviction for manslaughter. Further, the defendant did not at any time press to have any of the facts or circumstances surrounding the crime admitted as evidence. The bare assertion that the trial court in any way hampered or interfered with his right of cross-examination of Cannon is not supported by the record. We conclude that the record reflects that the defendant never attempted to introduce evidence beyond that which was permitted and that his claim that he was restricted from conducting cross-examination is totally unsupported by the record. Thus, the defendant's assertions that the trial court's actions denied him his rights of confrontation or cross-examination are without merit.

### III

The defendant next asserts that the trial court denied him his state and federal rights to confront his accuser by improperly allowing the state to read the testimony of Paul Darden, a state's witness, from a transcript of the defendant's probable cause hearing. The defendant claims that, at the time of the probable cause hearing, the trial court improperly refused defense counsel access to exculpatory evidence about the witness prior to cross-examination. We are unpersuaded.

---

[19] The transcript reflects that the codefendant did elicit from Cannon that his probation was not violated as a result of his carrying and firing a weapon during this incident. The codefendant also elicited from Cannon that he had been promised by Officer Francesco that he would not be charged with a crime arising out of this incident.

Certain additional facts are necessary for a proper resolution of this issue. At trial, the state called Darden to testify about the shooting. He replied, for the most part, that he had no recollection of the events about which he was being questioned. The state introduced the transcript of Darden's testimony from the defendant's probable cause hearing, claiming admissibility for substantive purposes under the doctrine of *State* v. *Whelan,* 200 Conn. 743, 513 A.2d 86, cert. denied, 479 U.S. 994, 107 S. Ct. 597, 93 L. Ed. 2d 598 (1986), and *State* v. *Outlaw,* 216 Conn. 492, 582 A.2d 751 (1990).

At the defendant's probable cause hearing, the defendant's counsel requested that the trial court allow the defendant access to any information that would lead to information that might reflect on Darden's credibility. The trial court denied the defendant's request because it would have made the probable cause hearing a full trial. The defendant posits that because he was denied extensive discovery prior to and during the probable cause hearing, he was denied the significant cross-examination demanded by *State* v. *Outlaw,* supra, 216 Conn. 506–508. The trial court, after analyzing the situation under both *Whelan* and *Outlaw,* allowed the transcript of Darden's testimony at the probable cause hearing to be read to the jury for substantive purposes.

General Statutes § 54-46a (a) provides in pertinent part: "(a) No person charged by the state, who has not been indicted by a grand jury prior to May 26, 1983, shall be put to plea or held to trial for any crime punishable by death or life imprisonment unless the court at a preliminary hearing determines there is probable cause to believe that the offense charged has been committed and that the accused person has committed it. . . ." That statute further provides in subsection (b) that "[t]he court shall be confined to the rules of evidence" and that "[n]o motion to suppress or for discovery shall be allowed in connection with such hear-

ing." Further, § 54-46a (b) expressly provides for the assistance of counsel and for the defendant's right to cross-examine the witnesses against him.[20] Thus, the ruling by the judge presiding over the defendant's probable cause hearing was consistent with the clear mandate of § 54-46a (b).

Once probable cause had been found, the defendant was entitled to all rights of discovery permitted to him by the provisions of the rules of practice, as well as by the General Statutes. See General Statutes §§ 54-86a and 54-86c; Practice Book § 732 et seq. Thus, at the time that the probable cause transcript was offered at trial, when the witness was available for cross-examination by the defendant, the full panoply of discovery was available to the defendant. He therefore had available to him all of the discovery materials necessary to have conducted a full cross-examination. Since the witness was available for cross-examination at the time that the state offered his prior testimony, the lack of discovery at the probable cause stage was inconsequential. The defendant was not prevented from conducting a full and complete cross-examination of the witness, utilizing to the fullest extent his discovered material for purposes of impeachment. He asserts that at the probable cause hearing he was denied access to "crucial exculpatory and impeachment information needed to carry out an effective cross-examination." He does not claim, however, that this material was unavailable to him at the time of trial or that it was any less exculpatory or usable for impeachment purposes. Further, we note that the defendant fails to set

---

[20] Article first, § 8, as amended by amendment seventeen to the constitution of Connecticut provides in pertinent part: "No person shall be held to answer for any crime, punishable by death or life imprisonment, unless upon probable cause shown at a hearing in accordance with procedures prescribed by law . . . ." In response to the constitutional mandate, the General Assembly enacted General Statutes § 54-46a.

forth the exact nature of the exculpatory and impeachment information that was lacking. We thus lack a factual predicate to even evaluate this claim.

We, therefore, cannot say that an unsubstantiated claim of a lack of unspecified information was fatal to an effective cross-examination at the probable cause hearing. In addition, our review of the transcript of the probable cause hearing clearly indicates that the defendant did in fact conduct a thorough cross-examination of Darden and, more importantly, that the witness was available at trial for cross-examination. See *State* v. *Outlaw,* supra, 216 Conn. 507–508.

As a second string to his bow, however, he asserts that the testimony of Darden at the probable cause hearing was inadmissible at trial because it denied him his right of confrontation guaranteed by the sixth[21] and fourteenth[22] amendments to the United States constitution and article first, § 8,[23] of the Connecticut constitution.[24] We are unpersuaded.

The sixth amendment to the United States constitution mandates that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted

[21] The sixth amendment to the United States constitution provides: "In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed, which district shall have been previously ascertained by law, and to be informed of the nature and cause of the accusation; to be confronted with the witnesses against him; to have compulsory process for obtaining witnesses in his favor, and to have the assistance of counsel for his defense."

[22] See footnote 12.

[23] Article first, § 8, of the Connecticut constitution provides in pertinent part: "In all criminal prosecutions, the accused shall have a right . . . to be confronted by the witnesses against him . . . ."

[24] Because the defendant has not sufficiently provided us with an independent analysis of his claim under the state constitution, we decline to consider this state constitutional claim. *State* v. *Hamilton,* 228 Conn. 234, 246 n.10, 636 A.2d 760 (1994).

with the witnesses against him . . . ."[25] "While a literal interpretation of the confrontation clause could bar the substantive use of any hearsay statement made by an *unavailable* declarant, the United States Supreme Court has rejected that view as 'unintended and too extreme.' *Ohio* v. *Roberts,* 448 U.S. 56, 63, 100 S. Ct. 2531, 65 L. Ed. 2d 597 (1980) . . . ." (Emphasis added.) *State* v. *Outlaw,* supra, 216 Conn. 504. The confrontation clause, however, may still operate to bar the admission of some evidence that might otherwise be admissible under one of the recognized exceptions to the hearsay rule. *Idaho* v. *Wright,* 497 U.S. 805, 814, 110 S. Ct. 3139, 111 L. Ed. 2d 638 (1990); *State* v. *Outlaw,* supra, 504.

The United States Supreme Court has adopted a two part test in order to protect the right of a criminal defendant to confrontation and still permit the admission into evidence of prior statements of an unavailable declarant as an exception to the hearsay rule. *Ohio* v. *Roberts,* supra, 448 U.S. 63; *State* v. *Outlaw,* supra, 216 Conn. 505. "First . . . [t]he prosecution must either produce, or demonstrate the unavailability of, the declarant whose statement it wishes to use against the defendant. [*Ohio* v. *Roberts,* supra, 65.]" (Internal quotation marks omitted.) *State* v. *Outlaw,* supra, 505. Once the prosecution satisfies the first prong of the test, it must also show that the statement bears adequate indicia of reliability to afford the trier of fact a satisfactory basis for evaluating its truth. *Ohio* v. *Roberts,* supra, 66; *California* v. *Green,* 399 U.S. 149, 160–61, 90 S. Ct. 1930, 26 L. Ed. 2d 489 (1970); *State* v. *Outlaw,* supra, 505.

Our review of the record clearly indicates that Darden's testimony at the probable cause hearing bears

[25] The sixth amendment to the United States constitution is made applicable to the states by the fourteenth amendment. *Pointer* v. *Texas,* 380 U.S. 400, 405, 85 S. Ct. 1065, 13 L. Ed. 2d 923 (1965).

sufficient indicia of reliability to permit submission of the transcript to the jury. His testimony was given under oath and was subject to the criminal penalties for perjury. *California* v. *Green,* supra, 399 U.S. 165; *State* v. *Outlaw,* supra, 216 Conn. 505. His testimony was given before a judicial tribunal and an adequate judicial record of the proceedings was kept. *California* v. *Green,* supra, 165; *State* v. *Outlaw,* supra, 505. The defendant was present for the entire probable cause hearing and was represented by counsel, although not the same counsel that represented him at trial. See *California* v. *Green,* supra, 165; *State* v. *Outlaw,* supra, 505.

We also conclude, contrary to the defendant's assertion, that defense counsel tested Darden's testimony at the probable cause hearing with "the equivalent of significant cross-examination." *Ohio* v. *Roberts,* supra, 488 U.S. 70; *State* v. *Outlaw,* supra, 216 Conn. 506. The transcript of Darden's testimony at the probable cause hearing reveals that defense counsel tested Darden's physical description of the defendant, recollection of the events that he described, including the fact that he did not see where the first shots originated and that only four of the five people at the end of the street had guns. Defense counsel also exposed the fact that the witness' recollection was refreshed by the questions that were asked. Defense counsel further asked the witness whether Peterson and Cannon were working for him at the time of the murder, and whether the witness used drugs. Defense counsel also developed the prior criminal record of the witness.[26] The record supports our conclusion that defense counsel's cross-examination "comported with the principal *purpose* of cross-examination: to challenge whether the declarant was sincerely telling what he believed to be the truth,

---

[26] We note that the direct examination of the witness is thirteen pages of transcript and the cross-examination is twenty-eight pages of transcript.

whether the declarant accurately perceived and remembered the matter he related, and whether the declarant's intended meaning is adequately conveyed by the language he employed. [*Ohio* v. *Roberts,* supra, 71]." (Emphasis in original; internal quotation marks omitted.) *State* v. *Outlaw,* supra, 506.

"The Confrontation Clause includes no guarantee that every witness called by the prosecution will refrain from giving testimony that is marred by forgetfulness, confusion, or evasion. To the contrary, the Confrontation Clause is generally satisfied when the defense is given a full and fair opportunity to probe and expose these infirmities through cross-examination, thereby calling to the attention of the factfinder the reasons for giving scant weight to the witness' testimony. [*Delaware* v. *Fensterer,* 474 U.S. 15, 21–22, 106 S. Ct. 292, 88 L. Ed. 2d 15 (1985)]." (Internal quotation marks omitted.) *United States* v. *Owens,* 484 U.S. 554, 558, 108 S. Ct. 838, 98 L. Ed. 2d 951 (1988); *State* v. *Jones,* 22 Conn. App. 665, 667, 578 A.2d 667 (1990). Further, the United States Supreme Court has stated that "[t]he Confrontation Clause guarantees only an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish." (Emphasis in original; internal quotation marks omitted.) *United States* v. *Owens,* supra, 559; *Kentucky* v. *Stincer,* 482 U.S. 730, 739, 107 S. Ct. 2658, 96 L. Ed. 2d 631 (1987); *State* v. *Couture,* 218 Conn. 309, 320–21, 589 A.2d 343 (1991); *State* v. *Menzies,* 26 Conn. App. 674, 685, 603 A.2d 419, cert. denied, 221 Conn. 924, 608 A.2d 690 (1992). Here, the defense clearly had an opportunity to test the witness' claim regarding his loss of memory and was also afforded a full opportunity at trial to test his credibility.

Most important is that the declarant was available and the state produced him as a witness at trial. The state offered his prior testimony at the probable cause

hearing only after the witness claimed lack of memory. When a witness has been unavailable, the United States Supreme Court has permitted that witness' testimony from a preliminary hearing to be admitted into evidence when the defendant was represented by counsel at the prior hearing, the testimony was under oath, the defendant was afforded an opportunity to cross-examine the witness and the proceedings were conducted before a judicial tribunal able to provide a judicial record of the proceedings. *Mattox* v. *United States,* 156 U.S. 237, 244, 15 S. Ct. 337, 39 L. Ed. 409 (1895). "But as a constitutional matter, it is untenable to construe the Confrontation Clause to permit the use of prior testimony to prove the State's case where the declarant never appears, but to bar that testimony where the declarant is present at the trial, exposed to the defendant and the trier of fact, and subject to cross-examination." *California* v. *Green,* supra, 399 U.S. 166–67. Here, the state made every effort to produce the declarant as a witness: it produced him at trial, swore him as a witness, attempted to conduct a meaningful direct examination and tendered him for cross-examination. Id., 167. "Whether [the declarant] then testified in a manner consistent or inconsistent with his preliminary hearing testimony, claimed a loss of memory, claimed his privilege against compulsory self-incrimination, or simply refused to answer, nothing in the Confrontation Clause prohibited the State from also relying on his prior testimony to prove its case against [the defendant]." Id., 167–68.

The defendant's claim that the use of the witness' testimony at the defendant's probable cause hearing as evidence at his trial violated his rights of confrontation is without merit.

### IV

The defendant next claims that the trial court improperly allowed the prosecutor repeatedly to submit to the

jury unsupported claims that the defendant had intimidated the state witnesses. We are unpersuaded.

Certain additional facts are necessary for a proper resolution of this issue. In the absence of the jury, the trial court permitted the state's attorney to ask Darden whether he had been told that if he testified in this case that his mother would be killed or in danger. The witness denied that he had received threats. The state then asked Darden whether he had told anyone that he had received threats and Darden denied that he had. Over the defendant's objection, claiming that a proper foundation had not been laid, the trial court, in the presence of the jury, allowed the prosecutor to ask Darden whether he was told that if he testified his mother would be in danger or be killed. Darden denied the query. The prosecutor then asked, "Isn't it a fact, sir, that you have told me that fact?" The defendant then stated, "I also renew my objection." The witness answered in the negative over the defendant's objection. On appeal, the defendant claims that the question was improper because it, in effect, made the prosecutor the witness. The defendant also claims that the state improperly asked the question knowing that the witness would deny it.

We first note that the claim raised on appeal is not the one presented to the trial court. The objection raised in the trial court was based on a claim that the questions directed to threats against the witness' mother lacked a proper foundation. On appeal for the first time, the defendant attempts to assert that the trial court's actions permitted the state's attorney to become an indirect witness against the defendant and, further, that the state improperly asked the witness a question that suggested an answer, knowing that the witness would deny the truth of the statement. We further note

that the defendant does not assert that the trial court improperly allowed the question because the state failed to lay a proper foundation.

The defendant fails to assert a constitutional basis for his claim and thus does not seek review under *State* v. *Golding,* 213 Conn. 233, 239–40, 567 A.2d 823 (1989), nor does he seek review pursuant to a claim of plain error. Practice Book § 4185. "Where the claimed error is first raised on appeal, and is not of constitutional dimension, this court will not review it." *State* v. *Baldwin,* 224 Conn. 347, 360, 618 A.2d 513 (1993). "[T]o review the defendant's claim, which has been articulated for the first time on appeal and not before the trial court, would result in a trial by ambuscade of the trial judge. . . . *State* v. *Brice,* [supra, 186 Conn. 457] . . . ." (Citations omitted; internal quotation marks omitted.) *State* v. *Robinson,* supra, 227 Conn. 741; *State* v. *Rogers,* 9 Conn. App. 208, 212, 518 A.2d 399 (1986), cert. denied, 202 Conn. 806, 520 A.2d 1288, cert. denied, 481 U.S. 1051, 107 S. Ct. 2185, 95 L. Ed. 2d 841 (1987). We thus decline to afford review to these unpreserved evidentiary claims.

V

The defendant next claims that the trial court permitted the prosecutor to make improper and unlawful arguments to the jury. We are unpersuaded.

Certain additional facts are necessary to a proper resolution of this issue. The state, during its case-in-chief, called Maria Diaz as a witness. She testified that part of her taped conversation with the New Haven police had been erased. The tape was not admitted into evidence. The state's attorney, in rebuttal argument, discussing Diaz' testimony, argued: "She said, oh, the police were erasing when I wouldn't go along with them. Well, where is the tape? I tried to put the tape in; I tried to put the whole tape in. If there is blanks

on this tape, if it's erased, why the objection so strenuously to it coming in? Where is it?'' The defendant objected. The state's attorney also stated in the rebuttal argument: ''The details that Detective Gleason testified to, and that was a witness that was called by defendant Carter in this case, the only witness that was called was Detective Gleason.'' The defendant did not object to this statement. At the conclusion of the rebuttal argument, the defendant submitted a handwritten request that the court include a limiting instruction concerning what the defendant characterized as the improper argument by the state's attorney in rebuttal.[27] The trial court stated in its charge to the jury that ''there is some reference in one of the arguments to a tape not being allowed in. I have allowed in all of the evidence that I believe is fair in this case, and you are to direct your attention only to those exhibits that came in, not those that may have been alluded to by counsel in argument.'' The trial court additionally instructed the jury that its recollection of the evidence controlled and not that of counsel or the court.

## A

We cannot compare the charge given and the defendant's request since the defendant failed to ensure that the court clerk include the handwritten request to

[27] Although the transcript of the proceedings refers to a handwritten request to charge on the issue of improper argument, it is not included in the record or appendices of the case, nor is it in the trial court file.

The transcript reference is as follows:

''[Defense Counsel]: I take exceptions to the court not giving the instruction as requested on Mr. Turcotte's improper rebuttal argument.

''The Court: Well, now, this is on—I realize that it was done over the noon hour and it's handwritten. As a matter of fact, I think I did cover those matters.

''[Defense Counsel]: You mentioned it, but you asked for my exceptions, and I'm giving you my exceptions.

''The Court: Okay.

''[Defense Counsel]: I take exception to what you did, and, in fact, you didn't give it the way I requested.''

charge in the certified file transmitted to this court, and failed to include the request to charge in its brief or appendix. Practice Book § 4065 (d) (1).[28] Thus, we are unable to review a claim that the charge as given failed to comport with the request to charge.

We also note that in the colloquy between counsel and the trial court, counsel conceded that the trial court "mentioned it," and then asserted that his objection was that it was not given as requested. We have long held that a refusal to charge in the exact language of a request will not constitute error if the requested instruction is given in substance. *State* v. *Gray,* 221 Conn. 713, 729, 607 A.2d 391, cert. denied,      U.S.      , 113 S. Ct. 207, 121 L. Ed. 2d 148 (1992); *State* v. *Commerford,* 30 Conn. App. 26, 32, 618 A.2d 574, cert. denied, 225 Conn. 903, 621 A.2d 285 (1993). We are satisfied that the defendant's concession is sufficient to warrant the conclusion that his complaint was directed to the trial court's failure to charge in the exact language of the request. Our review of the trial court's instruction convinces us that it properly directed the jury's attention to not consider the state's attorney's improper argument concerning the defense counsel's objections that resulted in the exclusion of the evidence under attack.[29] The defendant bears the burden of

[28] Practice Book § 4065 (d) (1) provides: "In a jury case when error is claimed in the trial court's refusal to charge as requested, the party claiming such error shall request the clerk of the trial court to include, in the certified file, copies of the relevant written request to charge contained in the trial court's file and shall include in the brief of that party or the appendix thereto a verbatim statement of the relevant portions of the charge as requested and as given by the court and any relevant exceptions to the charge as given and shall recite in narrative form any evidence which it is claimed would entitle that party to the charge as requested, with appropriate references to the page or pages of the transcript."

[29] We further note that in addition to the material set forth in the text, the trial court also charged the jury as follows regarding objections and stricken material: "[T]hat during the course of the trial certain objections on occasion were raised, some of them were sustained, some of them were

showing that the prosecutor's statement was "prejudicial in light of the entire proceeding." *State* v. *Ubaldi,* 190 Conn. 559, 562, 462 A.2d 1001, cert. denied, 464 U.S. 916, 104 S. Ct. 280, 78 L. Ed. 2d 259 (1983); *State* v. *Brokaw,* 32 Conn. App. 505, 512, 629 A.2d 1170 (1993). "[T]he touchstone of due process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor. *Smith* v. *Phillips,* 455 U.S. 209, 219, 102 S. Ct. 940, 71 L. Ed. 2d 78 (1982) . . . ." (Citations omitted; internal quotation marks omitted.) *State* v. *Richardson,* 214 Conn. 752, 761, 574 A.2d 182 (1990); *State* v. *Brokaw,* supra, 512.

Our review of the proceedings coupled with the trial court's charge in response to the defense counsel's request for a limiting instruction leads us to conclude that the state's attorney's isolated remark did not impact on the fairness of the trial. " '[A] prompt cautionary instruction to the jury regarding improper prosecutorial remarks obviates any possible harm to the defendant.' *State* v. *Ubaldi,* supra, [190 Conn.] 563." *State* v. *Brokaw,* supra, 32 Conn. App. 513. Thus, the defendant's claim is without merit.

## B

The defendant also argues in his brief that the state's attorney improperly commented on the defendant's fail-

overruled, this is all done in your presence. And I want you to understand that the attorneys, when they raise an objection, were simply doing their jobs, and doing what they thought was necessary to protect their varied interests in this case, and, obviously, you are not to in any way hold against any of the attorneys—hold them responsible for any objections they may have made or for whatever exceptions they took. And, certainly, insofar as any evidence that came in during the course of the trial, I instructed you that sometimes an objection would be raised and an answer would have been blurted out, and I've instructed you to strike it from your mind and memories and not to include it in the deliberative process. That's exactly what I mean. Anything that was ordered stricken during the course of the trial shall take no part in the deliberative process."

ure to testify on his own behalf. A full examination of the arguments of counsel, and a complete review of the argument at the completion of the state's rebuttal argument, fails to disclose any objection to the state's argument on the basis of a an improper comment concerning the defendant's failure to testify. A review of the arguments fails to disclose that such an event occurred. The record discloses that during argument, the state referred to the fact that the defendant called Gleason as his only witness. The reference does not appear to implicate the defendant's right not to testify and, further, the defense counsel interposed no objection. The defendant does not seek review of these claims pursuant to *State* v. *Golding,* supra, 213 Conn. 239–40, nor does he seek review under the plain error doctrine. Practice Book § 4185. Our review of the record discloses that the alleged impropriety represents, at worst, an isolated instance of alleged misconduct, unrepresentative of a pattern of conduct repeated throughout the trial. *State* v. *Hammond,* 221 Conn. 264, 290, 604 A.2d 793 (1992); *State* v. *Lucci,* 25 Conn. App. 334, 349, 595 A.2d 361, cert. denied, 220 Conn. 913, 597 A.2d 336 (1991). Thus, we decline to afford review of a claim that appears in one instance to be nonexistent, and in two instances, unpreserved. See *State* v. *Robinson,* supra, 227 Conn. 714. The defendant's claim is without merit.

VI

The defendant next claims that the trial court denied the defendant a trial by jury by charging the jury on consciousness of guilt. We are unpersuaded.

Certain additional facts are necessary for a proper resolution of this issue. During the state's rebuttal case, Carlos Santos testified about his observations on the day of the murder. He stated that he was working on the outside brick on the Jewish Home, at the corner of Asylum Street and Davenport Avenue. He also stated that he was approximately fourteen feet above

the ground. Santos further testified that he heard gun-shots and hid behind a tarp. After the shooting, he looked out of the tarp and saw three black males running down Asylum Street and then Davenport Avenue. Santos could not see the men's faces but did testify that they were black. During the jury charge, the trial court instructed the jury on consciousness of guilt arising from this testimony and the testimony of "a few people."[30] The codefendant took an exception to this charge.[31] The trial court declined to change the charge.

[30] The trial court instructed the jury in the following manner: "Now, reference was made before as to consciousness of guilt, and I want to give you a charge on that. The law of our state recognizes a concept known as consciousness of guilt. . . . When a person is on trial for a criminal offense, it's proper for the state to offer, and for you to consider, evidence of the defendant's conduct as well as any statements he may have made after his alleged commission of the crime or crimes to show that the defendant had a guilty knowledge. In other words, this evidence would tend to show that the defendant was conscious of his own guilt and his actions were in accordance with that of a guilty mind.

"In this regard, you have heard testimony that the defendants fled from Asylum Street after the victim fell to the ground, and I believe that was testified to by a few people, the gentlemen from Portugal[, Carlos Santos,] the state produced as its rebuttal witness.

"Now, flight of a person in leaving the scene of a crime unexplained is one type of conduct which tends to prove consciousness of guilt. The flight of a person from a crime is one circumstance which, when considered together with all of the other facts in a case, may justify a finding of guilty. While flight, if shown, is not conclusive, it is admissible to show a guilty conscience, and, if believed, may be strong evidence that a person is indeed guilty. It is for you to decide whether the [defendant's] action reflected a guilty mind. Should you determine that the [defendant's] flight does not provide evidence of a guilty mind, then it is still for you to determine what weight, if any, you may wish to attribute to it."

[31] The exception regarding consciousness of guilt was as follows:

"[Defense Counsel]: The only exception I have to do with consciousness of guilt charge indicating that the defendant . . . fled from the scene, and that Mr. Santos saw the defendant . . . flee. Mr. Santos testified that he had not seen, he saw four men run, but he didn't know who they were.

"The Court: I could understand your concerns with that, I just pointed that out. And I think my general charge saying its their recollection of all the evidence, he saw four people scattering around the corner. Any other exceptions?

"[Defense Counsel]: No other exceptions."

The defendant concedes, as he must, that under our law, a charge on flight as evidence of consciousness of guilt may be given in an appropriate case. *State* v. *Holloway,* 209 Conn. 636, 651, 553 A.2d 166, cert. denied, 490 U.S. 1071, 109 S. Ct. 2078, 104 L. Ed. 2d 643 (1989); *State* v. *Reddick,* 33 Conn. App. 311, 330, 635 A.2d 848 (1993). He posits, however, that the trial court "grossly misstated the evidence and did so in a way that was highly prejudicial to the defendant." We do not agree.

The defendant focuses only on the fact that the trial court, in discussing this issue, stated that Santos had testified that he had seen the defendant flee after the victim fell to the ground. The defendant ignores the context in which the trial court made the statement that it believed that several people had testified to this fact. In fact, a review of the transcript reveals that at least two witnesses testified that they saw the defendant running away after the victim fell. Santos also testified that he observed four black men running after the victim fell, although he could not identify any of them. Thus, the trial court correctly stated that several persons had identified the defendant as running away after the murder, but he misstated the testimony of Santos.

We first note that the defendant has not raised a claim that the charge denied him any state or federal constitutional rights. Thus, we review this only as a claim of instructional error rather than a claim of constitutional magnitude. *State* v. *Cerilli,* 222 Conn. 556, 567, 610 A.2d 1130 (1992); *State* v. *Tillman,* 220 Conn. 487, 501, 600 A.2d 738 (1991), cert. denied,      U.S.     , 112 S. Ct. 3000, 120 L. Ed. 2d 876 (1992); *State* v. *Davis,* 32 Conn. App. 21, 34, 628 A.2d 11 (1993). Thus, our inquiry is directed to whether the defendant has established that it was reasonably probable that the jury was misled. *State* v. *Cerilli,* supra, 567; *State* v. *Tillman,* supra, 501; *State* v. *Davis,* supra, 34. We

conclude, after reviewing the charge as a whole, that the trial court's misstatement of fact was not so misleading in and of itself, and, when coupled with the fact that the trial court correctly stated that several witnesses had testified as to the flight by the defendant, no reasonable probability exists that the jury was misled. *State* v. *Cerilli,* supra, 567. The defendant's claim is without merit.

## VII

The defendant next claims that the trial court improperly denied him his state and federal rights to an impartial jury by encouraging the jury to deliberate during the presentation of evidence. We are unpersuaded.

Certain additional facts are necessary for a proper resolution of this issue. Before the prosecution called any witnesses, the jury requested that the trial court reread the information against the defendant. The trial court told the jury, "What I intend to do is just read the informations to you. I'm going to read you the three applicable statutes that might help you in your deliberations. Would that satisfy your needs in this matter?" The defendant did not object either to the trial court's statement or to the procedure adopted by the trial court.

In addition, the trial court, in its preliminary instructions before the commencement of the evidence, admonished the jury that it was not to discuss the case until it was submitted to them for decision at the completion of the entire trial proceedings. Throughout the trial, the trial court admonished the jury against discussing the case until the completion of the evidence and the charge regarding the law to be applied.

We note that this claim is unpreserved and that the defendant does not seek review under *Golding* or the plain error doctrine. Practice Book § 4185. Even had

the defendant properly requested review under *Golding*, it is unlikely that he could have prevailed, since he cannot comply with the threshold requirement that he provide a record that is adequate for us to afford review of the claim. *State* v. *Golding,* supra, 213 Conn. 240. "If the facts revealed by the record are insufficient, unclear or ambiguous as to whether a constitutional violation has occurred, we will not attempt to supplement or reconstruct the record, or to make factual determinations, in order to decide the defendant's claim." Id. Here, the defendant has failed to provide a record adequate to properly review this claim. Thus, we will not afford review of this unpreserved claim.

## VIII

The defendant next claims that the trial court improperly denied him his state constitutional right to have a jury trial conducted before a sworn jury of twelve people. We are not persuaded.

Certain additional facts are necessary for a proper resolution of this issue. On Friday, January 10, 1992, after the completion of the defendant's case-in-chief, a juror informed the trial court that a family member was critically ill and that she might not be able to continue her duties as a juror. The trial court told the juror that there were two alternates and that "as Caesar said to his troops, we will cross that bridge when we get to it." On Monday, January 13, 1992, prior to final arguments by the parties, the juror informed the trial court that her relative had died. The trial court conferred with the prosecutor and defense counsel and they agreed to allow the juror to leave prior to final arguments. Further, all parties agreed that the defense counsel could pick one of the two alternates to sit on the jury after the charge. After the charge to the jury was completed, an alternate was selected to be a juror.

We note that the defendant does not explicitly seek review under *Golding,* or under the plain error doctrine. Even had the defendant properly requested review under *Golding,* it is unlikely that he could have prevailed, since he cannot comply with the second requirement that the alleged claim is of constitutional magnitude or the third requirement that he was clearly deprived of a fair trial. *State* v. *Golding,* supra, 213 Conn. 239–40.

A capital offense is a crime "for which death penalty may, but need not necessarily, be imposed." Black's Law Dictionary (6th Ed. 1990). Murder in violation of General Statutes § 53a-54a (a) is a class A felony, punishable by life imprisonment. General Statutes § 53a-35a (2). We recognize that General Statutes § 54-82 (c) provides a defendant charged with a crime punishable by life imprisonment to a twelve person jury. Amendment four of the Connecticut constitution, however, states: "The right of trial by jury shall remain inviolate, the number of such jurors, which shall not be less than six, to be established by law; but no person shall, for a capital offense, be tried by a jury of less than twelve jurors without his consent. . . ." Therefore, while the defendant does have a statutory right to a twelve person jury, he does not have such a constitutional right. "Robing garden variety [statutory] claims in the majestic garb of constitutional claims does not make such claims constitutional in nature." (Internal quotation marks omitted.) *State* v. *Reddick,* supra, 33 Conn. App. 331–32; *State* v. *Ulen,* supra, 31 Conn. App. 37.

Further, the defendant fails to show that the naming of the alternate juror as a regular juror after the charge to the jury deprived him, in any way, of a fair trial. Alternate jurors, by statute, must have the same qualifications and be selected in the same manner as

regular jurors. General Statutes § 54-82h (a).[32] Further, the alternate jurors sit in the trial for the entire case and hear and observe the trial in the same manner as the regular jurors until the time of deliberation. General Statutes § 54-82h (c). An alternate juror, once selected to be part of the regular jury, becomes part of the regular jury "as though such juror had been a member of the regular panel from the time when [the case] was begun." General Statutes § 54-82h (c). Thus, the jury at all times consisted of twelve regular jurors.

Further, the fact that the alternate was not sworn in as a regular juror prior to final arguments does not affect the fairness of the trial. General Statutes § 1-25[33]

[32] General Statutes § 54-82h provides in pertinent part: "(a) In any criminal prosecution to be tried to the jury in the superior court if it appears to the court that the trial is likely to be protracted, the court may, in its discretion, direct that, after a jury has been selected, two or more additional jurors shall be added to the jury panel, to be known as 'alternate jurors.' Such alternate jurors shall have the same qualifications and be selected and subject to examination and challenge in the same manner and to the same extent as the jurors constituting the regular panel . . . .

"(c) Alternate jurors shall attend at all times upon trial of the cause. They shall be seated when the case is on trial with or near the jurors constituting the regular panel, with equal opportunity to see and hear all matters adduced in the trial of the case. If, at any time, any juror shall, for any reason, become unable to further perform his duty, the court may excuse him and, if any juror is so excused or dies, the court may order that an alternate juror who is designated by lot to be drawn by the clerk shall become a part of the regular panel and the trial shall then proceed as though such juror had been a member of the regular panel from the time when it was begun. A juror who has been selected to serve as an alternate shall not be segregated from the regular panel except when the case is given to the regular panel for deliberation at which time he shall be dismissed from further service on said case."

[33] General Statutes § 1-25 provides the following oath "FOR PETIT JURORS IN CRIMINAL CAUSES. You solemnly swear by the name of the ever-living God, that you will, without respect of persons or favor of any man, well and truly try, and true deliverance make, between the state of Connecticut and the defendant, whom you shall have in charge, according to law and the evidence before you; your own counsel, and your fellows', you will duly observe and keep; you will speak nothing, to any one, of the business

contains oaths for both regular jurors and alternate jurors in criminal cases. The oaths are *exactly* the same except that the alternate jurors oath is conditional upon becoming members of the regular jury. Because the oaths are exactly the same, a new oath is not required for an alternate juror to become a regular juror. Therefore, the defendant was not, at any time in the trial, without twelve jurors sworn to abide by the oath of a juror and the fairness of the trial was not affected.

## IX

The defendant next claims that he was denied his state and federal due process rights to be present and participate in his trial when the trial court denied him lunch. We are unpersuaded.

During the jury selection, the defendant's counsel told the trial court that the defendant had a problem obtaining a vegetarian lunch from the department of correction. The trial court told the defendant that it was powerless to do anything. In response, the defendant's counsel agreed and stated, "I thought that was true; I wanted to show the concern. I thought it should be voiced."

We note that the defendant does not explicitly seek review under *Golding* or under the plain error doctrine. Even had the defendant properly requested such

---

or matters you have in hand, but among yourselves, nor will you suffer any one to speak to you about the same, but in court; so help you God."

General Statutes § 1-25 provides the following oath "FOR ALTERNATE JURORS IN CRIMINAL CAUSES. You solemnly swear by the name of the ever-living God, that, if called upon to become a member of the jury to determine this cause, you will, without respect of persons or favor of any man, well and truly try, and true deliverance make, between the state of Connecticut and the defendant, whom you shall have in charge, according to law and the evidence before you; your own counsel, and your fellows', you will duly observe and keep; you will speak nothing, to any one, of the business or matters you have in hand, but among yourselves, nor will you suffer any one to speak to you about the same, but in court; so help you God."

review, it is unlikely that he could have prevailed since he cannot comply with the threshold requirement that he provide a record that is adequate for us to afford review of the claim. *State* v. *Golding,* supra, 213 Conn. 239–40.

It is clear from the record that the defendant agreed with the trial court's conclusion that it could not rectify his food situation. The defendant, for the first time on appeal, argues that the lack of a vegetarian meal deprived him of a "right to be fully present at his own trial." "If the facts revealed by the record are insufficient, unclear or ambiguous as to whether a constitutional violation has occurred, we will not attempt to supplement or reconstruct the record, or to make factual determinations, in order to decide the defendant's claim." Id., 240. The record is devoid of any indication that the lack of lunch at the voir dire stage of trial affected his right to be present at the trial. The defendant never mentioned, on the record, that the lack of lunch affected him in any way. Any review that we could afford this claim would be based on conjecture and speculation as to what affect, if any, the lack of lunch had on the defendant. The record is therefore inadequate to afford review.

The judgment is affirmed.

In this opinion the other judges concurred.